## THE MEXICO.

### In re COMPANIA TRANSATLANTICA.

(Circuit Court of Appeals, Second Circuit. January 7, 1898.)

#### No. 39.

1. COLLISION—PRESUMPTIONS—CARGO INSURERS—LIMITATION OF LIABILITY.
    The rule that where fault on the part of one vessel, sufficient to account for the collision, is established, the burden is then on her to clearly show fault on the part of the other, applies as against underwriters of the cargo of the vessel so in fault; and it makes no difference that the other vessel has sought the benefit of the statutes for limitation of liability.

2. SAME—STEAMERS AT SEA.
    The fact that one of two colliding steamers had the reversing gear of her engine clamped fast to the rock arm, so that from one to five minutes was required to release it after notice to reverse, *held* a gross fault, rendering her liable.

3. SAME.
    Where two steamers approached each other on the open sea at night, *held*, on the evidence, that the one having the other on her starboard bow, after crossing the bow of the privileged vessel, so as to have her green light constantly in view, began porting, and continued to do so until she struck the latter on the starboard side, and was consequently in fault; and *held*, further, that the privileged vessel was not in fault for not reducing her speed, or for starboarding so as to reduce the angle of collision. 78 Fed. 653, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

Petition for limitation of liability.

This proceeding was instituted by the petitioner in the district court, Southern district of New York, in consequence of a collision which occurred between the steamer Mexico and the steamer Nansemond, December 21, 1895. The Nansemond, as a result of the collision, sank, with her cargo, and all became a total loss. The Mexico sustained no damage. In May, 1896, libels were filed by the owners of the Nansemond, and by the underwriters of a portion of her cargo, against the Mexico, in the Southern district of New York, and thereafter petitioner filed its petition for limitation of liability. The value of the petitioner's interests in the Mexico and in her freight was duly appraised, and a bond given for the amount. Under the monition issued in the proceeding, claims were filed on behalf of the owners of the Nansemond and her cargo. The cause coming on to be heard, the district court held the Nansemond solely in fault for the collision, and entered decree accordingly. 78 Fed. 653. Appeal from said decree is prosecuted by the un-

derwriters of the principal portion of the Nansemond's cargo; the owner of the Nansemond having withdrawn from the appeal. The assignments of error bring up only the charges of fault against the respective vessels. The Mexico was an iron vessel, 331 feet in length. She was bound on a voyage from Puerto Cabello to Savanilla, and had reached a point about southerly from the easterly end of Oruba Island. Up to the time of sighting the Nansemond the Mexico's course was N., 70° W., corrected, or about W. by N. ¾ N. There was no reason, except the avoiding of other vessels, why she should alter this course until many miles further on her way. The Nansemond was a wooden steamer, 165 feet long. She was bound from Maracaibo to Curaçao. For some hours before sighting the Mexico, the Nansemond's course had been up from the mouth of the Gulf of Venezuela, N. E. by E. It was her practice (she ran regularly between the ports named), after getting Oruba light abeam, to turn to the starboard, laying a new course of E. ½ S. The collision occurred between 2 and 3 a. m. The night was dark, and not good for seeing lights. The stem of the Nansemond came in contact with the starboard side of the Mexico abaft amidships, with an apparent angle of about 45° between the Mexico's starboard side and the Nansemond's port side.

Wilhelmus Mynderse, for appellants.

J. Parker Kirlin, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). It might be quite sufficient, in this case, to affirm upon the opinion of the district judge. Indeed, when the record is examined,—especially the testimony given by the only survivors from the deck of the Nansemond,—it is difficult to understand upon what theory the decision of the district court could be reversed. The Nansemond, aside from any faulty navigation, was concededly in fault because her reversing gear had been made fast by a clamp to the rock arm, which would require from one to five minutes to release it after notice to reverse. Counsel for the Nansemond concedes that, when the vessels came in sight of each other, she had the Mexico on her starboard bow. She was therefore the burdened vessel, conceding her own fault in the matter of the reversing gear; and the burden was upon her to show some fault on the part of the privileged vessel, if the latter is to be made to share the loss. "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption, at least, adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." The City of New York, 147 U. S. 72, 13 Sup. Ct. 211; The Ludvig Holberg, 157 U. S. 60, 15 Sup. Ct. 477. Cargo underwriters stand in no better position, nor is this salutary rule of evidence in any way modified by the circumstance that the privileged vessel, when proceeded against in rem by some sufferer from the collision, has sought the benefit of limitation of liability under the statutes of the United States, even though her petition in such proceedings may aver that she has committed no fault. The Plymothian and The Victory (Nov. 29, 1897) 18 Sup. Ct. 149. The story of the Mexico is that the masthead and green lights of the Nansemond were sighted on the port bow of the Mexico; that they

narrowed on the port bow, and drew across until they were on the starboard bow; that the Nansemond hard a-ported her wheel suddenly, closing in her green light and exposing her red light, which seemed to be near by, whereupon the Mexico ordered her helm hard a-starboard, to ease the blow. The navigation thus attributed to the Nansemond is indeed extraordinary. Having crossed the Mexico's bows, and thus brought the latter's green light into view of those on the Nansemond, she is charged, not only with porting to such light, but with following the movement of the wheel with a hard a-port; thus swinging around from a position of safety on the Mexico's starboard bow till she came back upon the course of the Mexico, striking her on the starboard side, and at right angles to such course. The angle of collision was reduced from 90° to 45° by the starboarding of the Mexico "to ease the blow." However extraordinary this story, it is fully corroborated by the evidence of the two survivors from the deck of the Nansemond. Her captain and lookout were lost, but the boatswain (who was acting as second officer in charge of the watch) and the wheelsman have both escaped, and have testified in the cause. Landeborg, the wheelsman, left the wheel at 2 o'clock; but, a few minutes after, he relieved the new wheelsman, Thode, who wished to go to the toilet. He (Landeborg) was then alone in the wheel house, and the boatswain, Hellburg, outside. The captain was in his room, back of the wheel house. Before he went to the wheel to relieve Thode, witness saw a yellow light (the top light of a steamer) a little bit on the starboard bow. He reported it to the boatswain, who went to call the captain. The latter came out of his room, took the glasses, and went outside to look at it, and then stood at the window, and said, "A little bit port," which order the witness obeyed, putting the wheel over three spokes. Then the captain took a walk around, and told him again to port more, and he put it over three spokes more. Then, later, the other vessel being close by, the captain, who was standing in the window, called out, "Hard a-port," and ran up to witness, and helped to put the wheel over hard a-port. This witness added that he "saw nothing but the masthead light until the ships struck one another. Then he saw the rest of the lamps and the green light." The witness Hellburg was boatswain and acting second officer of the Nansemond. He was a native of the island of Curaçao, and was examined through an interpreter, one Vom Golderen, a steward employed on the same line of steamers to which the Nansemond belonged. Vom Golderen was from the neighboring island of Bonaire, apparently entirely familiar with the language which Hellburg spoke, and had conversed with him, on the voyage up, about the details of the collision. A second interpreter, representing the Mexico, was also present. There is certainly no reason shown for supposing that the witness was misunderstood or misinterpreted. Although not an educated man, he was apparently intelligent, 48 years of age, and had followed the sea for over 10 years. His testimony is as follows: The captain left the deck, and went to his room, about 1 o'clock. Witness was in the pilot house when Landeborg came to relieve Thode, and was looking through the pilot-house window. The vessel was then on a course

N. E. by E., and it was the witness' intention, when Oruba light got abeam, to call the captain, with a view to changing the course to starboard. When Landeborg came to the wheel, he called attention to a light ahead. Witness took the glass and looked. He saw a white light about a point and a half on the starboard bow (he estimates the distance at four or five miles), but could not see any side lights at that time. He then called the captain, who was asleep on the settee in his room, and who put on his slippers and came out at once. Both came on deck together. The captain went into the pilot house. The boatswain stood outside. The captain looked with the glasses, said it was a steamer, and told the man at the wheel to port. To the question, "When the captain gave this order to port, what lights could you see on the other steamer?" the witness answered, "Then I saw the green light." This witness himself heard only one of the three orders to port given by the captain, and subsequent testimony makes it uncertain whether or not he intended, by the answer above quoted, to say that at the moment of time when the captain gave the first order the witness saw the green light. It seems more probable that what he meant to say was that by the time the captain, having given his order, had come out of the wheel house, witness made out the green light. But he testifies positively, and with no contradiction or qualification, that he (witness) saw no red light from the Mexico, that he saw the green light a few minutes after he saw the white light, and that from the time he first saw the green light he kept on seeing it; that is, "from two o'clock until the collision" (the witness' own phrase), which he estimated was 20 minutes. Moreover, it is quite apparent from his evidence that, although "not allowed to say anything" about the navigation, the witness wanted to make some suggestion on the subject of this continued porting. It is difficult to understand why the captain of the Nansemond should have navigated as he did. Even assuming that when he first looked he saw the Mexico's red light, it must have been a very brief interval before the green light came into view and the red disappeared; and yet although, after the green appeared, it never subsequently disappeared, the captain persistently kept on porting to it. In view of this testimony from the Nansemond, it is not necessary to undertake to account for the apparent movements of that vessel, described by the Mexico's witnesses, on any theory that the Mexico was herself swinging. There is in the narrative given by those on the deck of the latter vessel the usual discrepancies as to distance, time, the bearing of lights, etc., but all agree in the statement that she made no change of course until in the jaws of collision. All the testimony, without a single exception, shows that, when sighted, the Nansemond must have been in such a position as to indicate positively to those on the Mexico that the latter was the privileged vessel, under the starboard-hand rule; and we are not to assume that they at once undertook to get out of the way of the burdened vessel, instead of keeping their own course, without some evidence to indicate that such was the fact. In view of the testimony from the Mexico, corroborated by the direct and positive evidence of Landeborg, the Nansemond's pilot, and of Hellburg, her boatswain, that the Mexico did not

change her course, down to the collision, the charge that the Mexico improperly starboarded her helm is not sustained by proof; and under the decision of the supreme court in The Britannia and The Beaconsfield, 153 U. S. 130, 14 Sup. Ct. 795, it certainly cannot be held to be a fault that she did not reduce her speed or stop. No other faults are charged against her, and we therefore concur with the conclusion of the district judge, that the Nansemond was solely in fault. The decree of the district court is affirmed, with costs.