## THE TRANSFER NO. 11.

### (Circuit Court of Appeals, Second Circuit. February 27, 1912.)

### No. 174.

COLLISION (§ 95*)—STEAM VESSELS CROSSING—VIOLATION OF RULES.

A collision in East River between two tugs, with tows alongside, on crossing courses, *held* due solely to the fault of the one having the other on her own starboard side, and therefore bound to keep out of the way, while the other kept her course and speed, instead of which she gave a signal of two blasts and tried to cross the other's bows.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty for collision by the R. G. Packard Company, owner of the tug Enterprise, against the tug Transfer No. 11; New York, New Haven & Hartford Railroad Company, claimant. Decree for claimant, and libelant appeals. Affirmed.

Alexander & Ash, for appellant.

James T. Kilbreth and Charles M. Sheafe, Jr., for respondent.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. On the morning in question the Enterprise, with a dredge lashed to her starboard side, started from Hell Gate down the East River, on the Manhattan side of Blackwell's Island, bound for Newtown creek. When about opposite Thirty-Fourth street, she headed across the river, angling on the Brooklyn shore to offset the effect of the ebb tide. Though the weather was hazy on the trip down, it was sufficiently clear to enable her master to see both shores until she reached the middle of the river off Thirty-Fourth street, when a fog from the lower harbor was blown up the river and enveloped her. At this time the Transfer No. 11, with two carfloats, one on each side, was proceeding up the river, but angling a little on the Brooklyn shore. When the tugs first saw each other, they were from 250 to 500 feet distant. The Enterprise had the Transfer on her own starboard side. She then gave a signal of two blasts of her whistle, ported her helm and proceeded to go ahead without reducing speed. The Transfer answered with an alarm, which the Enterprise answered and reversed her engine. The master of the Enterprise knew that the Transfer was the privileged vessel and that it was his duty to keep out of the way. He also knew that it was the Transfer's duty to keep her course and speed. Instead of following the rule, he concluded to substitute his judgment for the plain requirements of the law and attempted to cross the Transfer's bow. In other

words, he took the risk of violating the starboard hand rule and failed.

It is unnecessary to speculate as to what would have occurred had the rules been followed promptly and had the Enterprise stopped and reversed. We are strongly persuaded that the collision would have been avoided, but it is enough that the law was plainly violated, with the resulting damage. The Geo. S. Schultz, 84 Fed. 508, 28 C. C. A. 476.

We are unable to discover any negligence on the part of the Transfer. She was not proceeding at an improper rate of speed, she kept her course as the rule required, and the moment it became evident that a collision was imminent she stopped and reversed her engine.

It is argued that the presence of a fog prior to and at the time of the collision renders the starboard hand rule inapplicable. There was testimony tending to establish this contention, but the District Judge who heard the witnesses evidently was not impressed with its accuracy as he makes no allusion to the subject in his decision. The testimony amply warrants a finding that the fog was not so thick as seriously to interfere with navigation. The master of the Enterprise made a report to the local inspectors on June 11, 1909, in which he says:

"The weather was hazy but good seeing and the tide was ebb and nothing unusual occurred until we got near the mouth of the Newtown creek when I saw Transfer No. 11 broad off on my starboard bow. * * * At this time the weather commenced to thicken a little and I at once blew my alarm whistles."

The master of the Transfer in a similar report says:

"At 6:10 a. m. the fog lifted so I could see the Brooklyn and Long Island shore and at 6:15 I left Nineteenth street and cut over to the Long Island shore about 400 feet off, and proceeded along up to the right of the middle, to a point about opposite Newtown creek, when a dredge with a tug on its starboard side loomed up on my port side, crossing my bows at right angles and he immediately blew me two whistles."

There was undoubtedly some fog at the time in question, but the District Judge was entirely justified in believing that it was not thick enough to make this a case of special circumstances.

The decree is affirmed with costs.